Filed 1/12/22  In re J.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> C.L., <br><br> Defendant and Appellant. | D079475 <br><br> (Super. Ct. Nos. EJ3209, EJ3209B-G) |

APPEAL from orders of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel for Plaintiff and Respondent.

C.L. (Mother) appeals from the juvenile court's orders terminating her parental rights to her six children, J.E.L., D.G., J.Z.L., H.G., M.G. and J.G., under Welfare and Institutions Code section 366.26.[1] She contends the court rejected the beneficial parental relationship exception based on an improper analysis under the California Supreme Court's recent decision, *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). The San Diego County Health and Human Services Agency (Agency) disagrees, and further contends the termination orders are supported by the record. We agree, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Early Case Events and Review Hearings*

Mother has a history of violent relationships, and has struggled with homelessness, including living in a car. J.E.L. is 11 years old, D.G. is nine, J.Z.L. is eight, H.G. is five, and fraternal twins M.G. and J.G. are four.

A series of violent encounters led to the children's removal. In September 2019, Mother's male friend J.K. " 'sucker punched' " Mother, and she had a seizure and fell on J.G. In late November through early December, Mother let her ex-boyfriend Ian W. watch J.Z.L., even though she had a restraining order against him and J.Z.L. did not feel safe with Ian. She sent J.E.L. along to keep him safe; Ian hit J.Z.L. with a belt, causing bruising; and Mother later acknowledged J.Z.L. was abused multiple times while in Ian's care. In December, another male friend, K.S., forced his way into the car where the family was sleeping and punched Mother while she was holding M.G.

---

[1] Further statutory references are to the Welfare and Institutions Code unless noted. The children's fathers are not parties to this appeal. Mother also has an older child, who is in a legal guardianship with a relative and is not part of this case.

In December 2019, the Agency filed a petition under section 300, subdivision (a), for J.Z.L. and under section 300, subdivision (b) for the other children, alleging J.Z.L. was subjected to physical abuse, the others were exposed to violent confrontations, and all were at substantial risk of physical harm. The Agency filed its detention report, and the children were detained.

The Agency provided its jurisdiction and disposition report in January 2020. Mother visited J.E.L. and H.G. approximately two to three times a week, and called them daily; she visited D.G. and J.Z.L. once per week; and she regularly visited the twins. The caregivers also supervised a weekly visit for all children. The juvenile court removed the children from Mother's custody and ordered reunification services. They were eventually placed in three separate homes: J.E.L. and H.G. were placed with the paternal aunt, K.S.; D.G. and J.Z.L. were placed with foster parents Robert and Julia Q.; and the twins were placed with foster parents Steve and Megan B.

The six-month review report in August 2020 reflected Mother was slow to engage in services; was staying with a registered sex offender, K.F.; and was involved in recent domestic violence with him. Visitation with some children was by video and telephone for a time, due to the Covid-19 pandemic. By November 2020, Mother was making progress and doing more in-person visits. At the six-month review hearing, the juvenile court continued services.

In February 2021, the Agency filed its 12-month review report, and recommended termination of services and setting a section 366.26 hearing. The report addressed visitation, along with input from the therapists and caregivers. With respect to visitation, Mother called J.E.L. and H.G. twice per week, and saw them one to two times per month. J.E.L. tended to be upset after visits, and the aunt reported H.G. did not listen to Mother and

3

would "continually ask" when she was leaving. As for D.G. and J.Z.L., Mother sometimes promised to call and did not do so, but would call approximately twice a week. Mother had consistent in-person visits with the twins, but J.G. would ask to go home and both twins avoided the camera during video calls. The twins also showed anxiety around visits, according to their play therapist, and had regressive behavioral changes (e.g., urine regression, sleep disruption, throwing things, etc.).

As for input regarding the children, the report noted therapy was helping J.E.L., as he "endured a lot of pain with his mother and the people that she was around." H.G.'s therapist indicated that in H.G.'s mind, Mother was not safe, and the aunt said he was not bonded to Mother. D.G. and J.Z.L.'s caregivers reported they were doing well, although they said they missed Mother on occasion. D.G. spoke in therapy about traumatic experiences with Mother, and did not want to live with Mother unless she could provide a home, food, and safety.[2] J.Z.L.'s therapist said he was having less stress from "memories of abuse and domestic violence," felt safe with his caregivers, and was "disconnected" from Mother. The twins also appeared bonded to their caregivers, and sought food, hugs, and attention.

An addendum report reflected Mother remained in contact with K.F., despite a stay-away order imposed by his parole officer. At the 12-month review hearing in March 2021, the juvenile court terminated reunification services and set a section 366.26 hearing.

---

[2]  Both parties also note the social workers had D.G. participate in a "safety house" activity early in the case. She said her house would have cameras and "traps"; Mother and her siblings would live there; and Ian W. and others who "hurt mom" were not allowed.

B. *Post-Reunification Events*

In July 2021, the Agency provided its section 366.26 report, which contained detailed information about recent visitation, as well as the children's feelings and preferences.

Mother and the children had weekly virtual visits, and several in-person visits between March and June 2021. She and the aunt arranged the visits with J.E.L. and H.G. The aunt reported the children "do not interact with [Mother] much aside from asking [her] to bring specific items." At the last visit, H.G. reportedly asked "whether the visit was over," and J.E.L. had "short responses to [Mother] and appeared disengaged."

For the other four children, Mother had supervised group visits. She missed one visit, and sometimes arrived late, leading to the children being restless and upset (but excited when she arrived). Mother provided conversation and games, although she struggled to redirect misbehavior. D.G. engaged with Mother, including asking her to style her hair and reading together. But at one visit, D.G. became upset because Mother did not bring taffy to make with them, as promised, and only reluctantly joined a restaurant trip. J.Z.L. repeatedly expressed disinterest in activities and rejected direction from Mother, even leaving the visitation room over her objection to watch television and stating "you're not my mom[]." At times, he did ask Mother for hugs and sat on her lap. As for the twins, M.G. let Mother style her hair and laughed when they jumped rope, while sometimes disregarding her directions (e.g., throwing a juice bottle at J.G.). J.G. disengaged from activities, ignored directions, and left the room; he also said at one point, "I never want to come." He too enjoyed jump roping, and Mother was able to calm a tantrum. Each twin cried at the end of one visit, and Mother soothed them.

5

Turning to the children's feelings and preferences, the paternal aunt said J.E.L. and H.G. were "content and happy." The social worker explained adoption to J.E.L., noting that while Mother "may still be in contact with him[, she] would no longer be his legal parent[]." He agreed with adoption, and nodded "yes" when asked if he wanted to be adopted by the aunt. H.G. was too young to discuss adoption, but indicated "yes" when asked if he liked living with the aunt and wanted to stay in her home forever. D.G.'s therapist reported she was "doing really well." When asked to rate her willingness to be adopted by her caregivers on a 1-10 scale, she said she was a "10," stating, "I don't want to wait forever for my mom to act right." J.Z.L.'s therapist said he was "increasingly secure" in the placement and "asked . . . if he could start calling the foster parents mom and dad." When asked how he felt about adoption with the caregivers, J.Z.L. said "good." As for the twins, they referred to the caregivers as "mommy" and "daddy," sometimes calling Mother "other mommy." M.G. was clingy with the foster mother, while J.G. sought her attention. They were too young to provide input on adoption.

The Agency recommended termination of parental rights and adoption. Pertinent here, it stated that while Mother "expressed care and love for her children," and the children engaged with her and displayed affection during visits, they "showed no significant responses" in her absence and did "not routine[ly] request contact" with her. The Agency further stated that although the children "show a familiarity" with Mother, the "strength of the relationship does not meet a level" that would outweigh the benefits of adoption.

In September 2021, the Agency filed an addendum report addressing recent visits and a further assessment of Mother's relationships with the children. There were two supervised group visits in August, which J.E.L. and

H.G. joined. Mother continued to engage appropriately, and to struggle in managing the children. One time, J.G. struck her several times in the stomach and laughed while doing so; she unsuccessfully asked him to stop; and the other children joined in and ignored her requests to return to their activity. Another time, J.G. ran around yelling, while ignoring Mother; this upset J.Z.L.; and the twins' caregivers had to pick them up early. In the Agency's view, Mother's relationships with the children were "fair," and the interactions were "not indicative of a substantial relationship." It noted visits led to "observable behavioral changes"; J.E.L. "repeatedly stated his desire to remain" with the aunt, and favored adoption if his siblings were in a safe placement and in contact with him; and D.G. had concerns about Mother's companions. The Agency acknowledged Mother had a "notable relationship" with the twins, including calling her "momma" or "other momma," but said this did "not outweigh the benefits of adoption." The Agency also recognized the children "may experience emotions of sadness" if Mother's rights are terminated, but this could be mitigated with therapy.

C. *Section 366.26 Hearing*

The juvenile court held the section 366.26 hearing in September 2021. The court received the Agency's February 2021 status review report, section 366.26 report, and section 366.26 addendum into evidence, and heard testimony from Mother.

Mother testified her visits with J.E.L. and H.G. were great, and they would do activities like playing basketball, watching movies, and, for H.G., playing with building blocks. She would do arts and crafts with D.G. and J.Z.L., and would bring them "clothes, shoes, anything they pretty much ask for." She would also call and text if she had not heard from them. Mother said the visits with the twins were great too, stating they would play games;

7

she would do M.G.'s hair; and she would tell them she loved them and kiss them. She admitted having "a little bit of a setback" with J.G., but said a subsequent visit was "great." When asked if she had anything to add regarding her bond with the children, she said, "It's a great one. . . . [W]e don't leave on bad terms and everyone is happy to see mom [*sic*] when I enter the room."

The court then heard argument. Mother's counsel argued the beneficial parental relationship exception to adoption applied. County counsel disagreed, contending Mother did not fulfill a parental role, or share a secure attachment. The children's attorneys agreed with adoption. D.G. and J.Z.L.'s attorney noted they were aware their adoptive parent would "control how much they visit with their relatives," including Mother, and "if those visits occur at all." The twins' attorney acknowledged Mother was "almost textbook perfect" in recent visits, but maintained the twins did "not respond to her as . . . someone . . . in a parental role," as compared to their foster parents.

The juvenile court found by clear and convincing evidence that the children were likely to be adopted. It then found no statutory exception applied. The court explained that although "there's clearly a loving relationship here, . . . the Court in [*In re C.F.* (2011) 193 Cal.App.4th 549 (*C.F.*)] indicates that I have to find that a parent occupies a parental role in the child's life resulting in a positive parental attachment." The court further explained, "[I]t appears that the history of the case is such that the bond is traumatic, that . . . it's hard to indicate that there would have been a development of a positive parental attachment." The court acknowledged Mother appeared to be "trying hard now," but these were "time-sensitive

proceedings" and "we have to concentrate on the children because . . . childhood is brief." Mother timely appealed.

## DISCUSSION

Mother contends the juvenile court improperly rejected the beneficial relationship exception because it purportedly found she did not occupy a parental role for the children. We reject this characterization of the court's ruling, and conclude the court did not err in rejecting the exception.

### A. *Applicable Law*

#### 1. *Law Governing Termination of Parental Rights*

"[T]he goal at the section 366.26 hearing is '. . . to select and implement a permanent plan for the child.' " (*Caden C., supra*, 11 Cal.5th at pp. 630-631.) The juvenile court " 'may order one of three alternatives: adoption, guardianship or long-term foster care.' " (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) If the juvenile court determines there is "clear and convincing evidence . . . the child is likely to be adopted," then "the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should . . . select another permanent plan." (*Caden C.*, at pp. 630-631.)

The beneficial parental relationship exception in section 366.26, subdivision (c)(1)(B)(i), applies when the juvenile court finds a " 'compelling reason for determining that termination [of parental rights] would be detrimental' " to the child because " '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' " (*Caden C., supra*, 11 Cal.5th at p. 631.) The

parent "must show, by a preponderance of the evidence, three things.  The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted.  Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.  And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Id*. at p. 636.)

The visitation "question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' "  (*Caden C*., *supra*, 11 Cal.5th at p. 632.)  At the second step, "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond."  (*Autumn H*., *supra*, 27 Cal.App.4th at p. 576; accord, *Caden C*., at p. 632.)  "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents.  [Citations.]  Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern."  (*Caden C*., at p. 632; *ibid*. [not necessary, even if possible, to " 'quantitative[ly] measure[]' " amount of care provided by parent during visits].)  At the final step, "courts must assume that terminating parental rights terminates the relationship" and "need to determine . . . what life would be like for the child in an adoptive home without the parent in the child's life."  (*Id*. at p. 633; see *id*. at p. 634 ["courts should not look to whether the parent can provide a home for the child"]; *id*. at p. 634 [§ 366.26 hearing is "decidedly not a contest of who would be the better custodial caregiver"].)

## 2. *Standard of Review*

The California Supreme Court clarified the standard of review for orders terminating parental rights in *Caden C.* The Court explained the "substantial evidence standard of review applies to the first two elements," as they are both "essentially . . . factual determination[s]." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) The third element, which is the "ultimate decision" as to "whether termination of parental rights would be detrimental to the child due to the . . . relationship with [the] parent," is "discretionary and properly reviewed for abuse of discretion." (*Id.* at p. 640.)

Mother nonetheless argues that because the juvenile court purportedly committed legal error in rejecting the exception, we "may decline to engage in a substantial evidence review, and instead remand the matter for the juvenile court to apply the correct legal standard." Although we review claims of legal error de novo, the ultimate determination is still governed by the applicable hybrid standard of review. (Cf. *In re D.O.* (2016) 247 Cal.App.4th 166, 174 ["To the extent appellants contend the juvenile court erroneously construed the factors it was required to consider under section 366.26, subdivision (c)(1)(B)(v) [sibling relationship exception], we review the claim de novo. [Citation.] To the extent appellants challenge the juvenile court's ultimate determination, we apply the substantial evidence standard to the . . . underlying factual determinations, and the abuse of discretion standard to . . . weighing of competing interests"].) As we explain *post*, Mother does not establish the court erred here.

The cases cited by Mother do not support her position. They did not involve the adoption exceptions, and are otherwise distinguishable. (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 289 [applying de novo review to issue of legal standards for decision to terminate jurisdiction over nonminor

11

dependent; decision is usually reviewed for abuse of discretion, but a court "abuses its discretion when it applies incorrect legal standards," there was error, and the reviewing court could not conclude it was harmless]; *In re D.M.* (2015) 242 Cal.App.4th 634, 640, 643 [reversing jurisdiction finding about corporal punishment, which is typically reviewable for substantial evidence, where juvenile court erred in construing statute; when juvenile court applies "incorrect legal standard," reviewing court "may decline to engage in substantial evidence review and instead remand"].)[3]

## B. *Mother Does Not Establish Legal Error*

Mother contends the juvenile court rejected the beneficial relationship exception "on the basis that she did not occupy a parental role in the children's lives," which was inconsistent with *Caden C.* This contention mischaracterizes the juvenile court's ruling, and relies on distinguishable authority. We explain.

First, the juvenile court did not reject the exception based on a finding that Mother did not occupy a parental role. Rather, the court stated it had to "find that a parent occupies a parental role in the child's life resulting in a positive parental attachment," and that although there was a "loving relationship," the "bond [was] traumatic" and not indicative of a "positive parental attachment." Viewed in context, the court properly focused on the nature of the relationship between the children and Mother, and found that, on balance, it was negative, rather than positive. (*Caden C.*, *supra*,

---

[3] Even if there were error, we would only reverse if it were prejudicial. (*In re Celine R.* (2003) 31 Cal.4th 45, 59-60.) We note that analysis does not focus on whether Mother had any evidence for her position, as she suggests at one point, but on whether she had a "reasonable probab[ility]" of a more favorable result absent such error (as she acknowledges elsewhere). (*Ibid.*)

12

11 Cal.5th at p. 632 [factors include " 'the "positive" or "negative" effect of interaction between parent and child' "].) Although the court used the term "parental role," it did not find she lacked one, and it did not discuss matters disapproved in *Caden C.*, like her ability to provide a particular amount of care or house the children, or the care they received in their placements. (*Caden C.*, at pp. 632, 634.)

Second, we disagree with Mother that the juvenile court's citation to *C.F.*, *supra*, 193 Cal.App.4th 549, reflects the juvenile court considered the attorneys' arguments about the children not viewing her as a parent. Counsel arguments are just that—arguments—and there is no indication the court was moved by them. (Compare *In re J.D.* (2021) 70 Cal.App.5th 833, 864 (*J.D.*) [juvenile court appeared to be swayed by attorney argument regarding child viewing placement as home].) Further, *Caden C.* did not disapprove of *C.F.*, and did confirm the proposition for which the juvenile court cited it: the attachment to the parent must be positive. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-638, fns. 5-7.)

Third, Mother attempts to rely on three recent decisions that reversed orders inconsistent with *Caden C.*, but each is distinguishable. (See *In re B.D.* (2021) 66 Cal.App.5th 1218 (*B.D.*); *J.D.*, *supra*, 70 Cal.App.5th 833; *In re D.M.* (2021) 71 Cal.App.5th 261 (*D.M.*).)

In *B.D.*, the juvenile court found the exception did not apply because the parents " 'must show that they occupy a parental role,' " which " 'typically arises from day-to-day interactions' "; the grandmother met the children's daily needs; and the parents' untreated substance abuse was a " 'core issue.' " (*B.D.*, *supra*, 66 Cal.App.5th at pp. 1226-1227.) We reversed because the juvenile court erred in several respects, including failing to examine how the substance abuse impacted the parent-child relationship; failing to consider if

13

there was a significant, positive, emotional attachment; and referencing the daily care by the grandmother, while querying if the parents filled a parental role. (*Id.*, at pp. 1227-1228, 1231.) We also explained a substantial attachment results from the "attention to the child's needs"; a positive attachment is "not detrimental," but "is nurturing and provides the child with a sense of security and stability"; and an emotional attachment means "the child views the parent as more than a mere friend or playmate and [whose] interactions with the parent were not ambivalent, detached, or indifferent." (*Id.* at p. 1230.) Unlike in *B.D.*, there is no indication the juvenile court here considered anything improper or failed to consider whether Mother's relationships with the children were substantial, positive, and emotional in the relevant ways.

In *J.D.*, the visitation logs provided evidence of a substantial, positive, emotional attachment, and the caregiver acknowledged the "positive bond," but the juvenile court found the relationship did not " 'amount to [a] parental bond.' " (*J.D.*, *supra*, 70 Cal.App.5th at pp. 851, 855-856.) The Court of Appeal reversed. (*Id.* at p. 870.) It could not be "certain the juvenile court did not consider factors disapproved" in *Caden C.*, noting a reference by the court to how long the child was in the placement, among other things. (*Id.* at pp. 854, 864-865.) It also criticized the agency, which "provided very little information . . . about the quality of [the] relationship . . . ." (*Id.* at p. 860.) Here, the juvenile court did not find a parental bond was lacking, but rather that the bond was traumatic, and Mother alleges no other improper factors. Further, the Agency reports provided detailed information on Mother's visits and relationships with the children.

*D.M.* does not aid Mother, either. The juvenile court found the father failed to attend "dental or medical appointments" and "[h]as not risen to the

14

level of a parent," in rejecting the exception. (*D.M.*, *supra*, 71 Cal.App.5th at p. 270.) The Court of Appeal reversed. It explained the court equated the parental role with attending to medical matters and "said nothing about the attachment between father and [the] children," whereas "*Caden C.* made clear the . . . exception is not focused on a parent's ability to care for a child or some narrow view" of a parent-child relationship. (*D.M.*, at pp. 270-271, italics omitted.) The court also observed the agency reports gave "little evidence about the quality of the visits" and the "children were rarely, if ever" asked how they felt about father or the visits. (*Id.* at p. 270.) Here, the juvenile court did properly focus on the attachment between Mother and the children, merely mentioning the parental role in doing so, and, again, the Agency reports were adequate.[4]

C. *Mother Does Not Establish The Court Erred in Finding The Beneficial Parent-Child Relationship Exception Did Not Apply*

Mother contends a reasonable trier of fact could have found each child had a beneficial relationship with her. That is not the relevant question. We have concluded there was no legal error, and the issue before us now is whether substantial evidence supports the juvenile court's findings. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) Even if we construed Mother's evidentiary argument as a substantial evidence challenge, we would reject it.[5]

---

[4] Because the juvenile court here did not base its decision on a finding that Mother lacked a parental role, we take no position on whether it remains a proper factor for consideration.

[5] Mother also argues she met the visitation element; the Agency states in a footnote that visitation was only consistent as to some children. Given we conclude the record supports the finding that there was no beneficial relationship, we need not resolve this disagreement.

15

The record supports the juvenile court's finding that Mother's bond with the children was traumatic, rather than positive, and further shows that despite pleasant, loving visits, they lacked the requisite attachment to her.

First, input from the therapists and others reflected the children experienced safety concerns and anxiety in relation to Mother—not the nurture, security, and stability of a positive relationship. J.E.L. "endured a lot of pain" with Mother and those around her, and was upset after visits. H.G. did not view Mother as safe, and he would ask when visits were ending. D.G. had concerns about Mother's ability to provide safety, and about her companions. For J.Z.L., who had been abused by Mother's ex-boyfriend, he remembered the abuse and was disconnected from Mother, even stating "you're not my mom[]." The twins were anxious surrounding visits with Mother, and showed regressive behavioral changes. Even if her relationship with the twins was notable, as the Agency stated, the juvenile court could still find it was not positive.

Second, although Mother's visits with the children were often pleasant and affectionate, they do not reflect their attachments were substantial, positive, and emotional. J.Z.L. and J.G. repeatedly disengaged from activities and ignored Mother, with the other children withdrawing at times, too; some children sometimes showed interest mainly in the items Mother brought them. There was little evidence of distress when visits ended or about not seeing her, other than crying by the four-year old twins at the end of one or two visits and D.G. and J.Z.L. occasionally mentioning they missed her. And the children did not routinely ask to see her. Mother herself described the bond as follows: "It's a great one . . . . [W]e don't leave on bad terms and everyone is happy to see mom [*sic*] when I enter the room." Being happy to see someone, and on great terms when one leaves, is indicative of friendship,

16

not a substantial, positive, emotional attachment. (See *B.D.*, *supra*, 66 Cal.App.5th at p. 1230 [child must "view[] the parent as more than a mere friend"]; *In re J.C.* (2014) 226 Cal.App.4th 503, 529 ["It is not enough to show that the parent and child have a friendly and loving relationship"].)

Mother's arguments lack merit. First, she cites evidence "capable of supporting the second element," such as positive interactions like playing basketball with J.E.L. and H.G. and doing D.G.'s hair; J.Z.L. seeking hugs from her; and her own testimony that she had a great bond with the twins. Yet, she concedes there is evidence to the contrary. Our review is for substantial evidence, and we cannot reweigh that evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 640 ["In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' "].)

Second, Mother contends the juvenile court "did not attempt to resolve" conflicts in the evidence, and it "does not appear that the . . . court gave each child individualized consideration . . . ." We presume the juvenile court performed its regular duty and considered all necessary matters. (Evid. Code, § 664; cf. *In re Julian R.* (2009) 47 Cal.4th 487, 498-499.) That the court decided against Mother does not mean it failed to resolve evidentiary conflicts or to consider each child.

Further, although the juvenile court did not expressly address the third step, it could reasonably conclude that, even if a sufficiently beneficial relationship existed, terminating it would not be detrimental when balanced against the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The children enjoyed Mother's company at visits and were affectionate, but their overall relationships with her were marked by trauma, anxiety, and indifference. At the same time, the children were doing well in their

17

placements, and J.Z.L. in particular was experiencing reduced stress and felt safe. Further, J.Z.L., J.E.L., and D.G. all expressed a preference for adoption (while H.G. indicated he wanted to stay in his placement, and the twins were too young to have an opinion). Indeed, J.E.L. "repeatedly stated" he wanted to stay with the paternal aunt, and D.G. rated her willingness to be adopted a "10" out of 10. The only evidence of potential detriment was the Agency's observation that the children "may experience . . . sadness"—not that they would—and that this could be mitigated with therapy.

Mother's arguments again lack merit. First, she maintains we should reverse based on legal error, and proceed no further. She has not established legal error, as explained *ante*.

Second, Mother contends the children's adoption preferences were "only marginally relevant" to the issue of detriment. We are not persuaded. It is for the juvenile court to weigh such preferences in exercising its discretion, and there was other evidence that termination of her parental rights would not be detrimental.

Mother's specific contentions here also lack force. She argues the children's views are not controlling due to their age, citing a statutory exception for children 12 years and older who object to termination of parental rights. (Cf. § 366.26, subd. (c)(1)(B)(ii).) That an older child's view is relevant to that exception does not mean a younger child's view is irrelevant to this one. (Cf. *Caden C.*, *supra*, 11 Cal.5th at p. 632 [courts consider "how children feel about . . . their parents," which "properly focuses the inquiry on the child"].)

Mother also argues that, under *Caden C.*, a court should determine " 'what life would be like . . . without the parent' "; the social worker told J.E.L. that Mother "may still be in contact" after adoption, and "presumably"

told D.G. and J.Z.L. something similar; and the children's preferences thus lack relevance. *Caden C.* was addressing the court's analysis, not the scope of potentially relevant evidence (*Caden C.*, *supra*, 11 Cal.5th at p. 632), and the social worker's comments to J.E.L. were at most vague, not misleading. As for D.G. and J.Z.L., their attorney indicated at the section 366.26 hearing that they were aware their adoptive parent would control whether visits with Mother would "occur at all." Regardless, even if the children lacked a full understanding of the impact of adoption, their preferences showed they were prepared for and desired separation from Mother and could still support a conclusion that termination would not be detrimental.

We conclude the juvenile court did not err in finding the beneficial relationship exception was inapplicable.

DISPOSITION

The orders are affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

DATO, J.

GUERRERO, J.

19